**NOT FOR PUBLICATION**                                                **CLOSED**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANATOL KIVMAN, | : |
| | : Civil Case No. 09-1205 (FSH) (PS) |
| Plaintiff, | : |
| | : **OPINION & ORDER** |
| v. | : |
| | : Date: July 27, 2010 |
| UNITED PARCEL SERVICE | : |
| | : |
| Defendant. | : |

**HOCHBERG, District Judge**:

**I.     INTRODUCTION**

Plaintiff Anatol Kivman brings this lawsuit alleging that he suffered discrimination by his former employer, UPS, due to his disability (diabetes). He alleges that UPS unlawfully terminated his employment, in violation of the New Jersey Law Against Discrimination ("LAD"). During discovery, he raised the additional argument that UPS failed to offer him an accommodation for his disability. Defendant now moves for summary judgment.

**II.    BACKGROUND**

On November 12, 2008, plaintiff was terminated from his job as a Senior Programmer Analyst ("SPA") in UPS's payroll department. Plaintiff had begun the job on January 7, 2008. He was informed that the reason for his termination was poor performance.

Plaintiff suffers from poorly controlled Type II Diabetes and Normal Pressure Hydrocephalus (NPH), which is an obstruction in the normal flow of cerebralspinal fluid through

the subarachnoid space.  His medical records indicate that he was diagnosed with diabetes in 2006; he was diagnosed with NPH in January 2009, subsequent to his termination.  His symptoms from these diseases have included substantial memory loss, inability to concentrate, and blurry vision.  Although plaintiff dates the onset of his memory loss around June 2008, his medical records report that he began experiencing memory loss in 2002.

The essential job functions of the SPA position include demonstrating the cognitive ability to 1) follow directions and routines; 2) work independently with appropriate judgment; and 3) concentrate, memorize, and recall.  Plaintiff understood these essential job functions, which were explained to him at his job interview.  It was also emphasized to plaintiff at the interview that the payroll project to which he would be assigned had aggressive deadlines.

Plaintiff's immediate supervisor was Lead Programmer Analyst Mary Ellen Weiland, who in turn reported to Project Leader Stephen Dudzinski.  Ms. Weiland assigned Igor Broytman, who was an SPA like plaintiff, to be plaintiff's mentor.  Early in his employment in the UPS payroll department, plaintiff worked on the pay-per-mile project.  Plaintiff's responsibilities included programming changes to the payroll system to permit UPS to pay drivers by the mile rather than hourly.  Certain errors appeared in his programs when the software was implemented.

From April through August 2008, plaintiff worked on enhancements to WARR.  WARR was a system that provided overtime pay to employees.  Plaintiff was responsible for producing reports and making program changes to WARR, as well as tracking employees who were entitled to additional pay.  Again, certain coding problems attributable to plaintiff's work surfaced after the WARR project went into production in August 2008.

While working on the WARR project, plaintiff frequently asked Mr. Broytman for written specifications for his assignments, since he had difficulty remembering or understanding oral instructions from Mr. Broytman.  On one occasion, Mr. Broytman allegedly responded that plaintiff held the same job title as he did and should be able to get the information for himself.  Plaintiff testified that he complained to Ms. Weiland about Mr. Broytman's refusal to provide him with written specifications, but nothing was done.  Plaintiff also testified that he asked Ms. Weiland for extensions of project deadlines and to have another employee check for errors in his programs, saying, "My sugar is out of control.  Sometimes it's too low for me to concentrate or understand what's going on."  He testified that Ms. Weiland refused his requests.

A change package is a tool used to implement new software into production.  Plaintiff testified that he is "an expert in change packages."  At UPS he worked on change packages together with Mr. Broytman.  Within a package, the duration dates and the install dates must match; otherwise, the tool will fail and not validate the package.  Frequently, the dates in plaintiff's packages did not match.  Plaintiff denies that these errors were his responsibility; he attributes the mis-matched dates to Ms. Weiland's tendency to re-use old packages.

Ms. Weiland and Mr. Dudzinski had several performance-related discussions with plaintiff in September and October 2008.  For example, on September 30, 2008, Mr. Dudzinski met with plaintiff to advise him that he was not recommended for a performance-based bonus under UPS's management incentive plan.  Mr. Dudzinski attributed the denial of the bonus to plaintiff's programming errors.  Plaintiff acknowledged that there were errors in his work.  In an email of the same date, plaintiff asserted that his performance issues were due to his diabetes.

On October 3, 2008, Maureen Hirsch, a human resources representative, met with plaintiff to determine whether he required an accommodation and whether he could perform the essential functions of his job. Plaintiff reported to Ms. Hirsch that he had difficulty with concentrating, memorizing, and recalling information – essential job functions for an SPA. Ms. Hirsch suggested that plaintiff could request a work-related accommodation through the company's ADA policy.

Plaintiff's supervisors informed him in October 2008 that he would be placed in the company's performance improvement plan ("PIP") due to his poor performance. They scheduled a meeting for Friday October 17, 2008 to discuss the PIP, but the meeting was canceled because plaintiff called in sick that day. Plaintiff then checked into Staten Island University Hospital on Monday October 20, 2008. He was diagnosed with uncontrolled diabetes and discharged on October 22, 2008. His medical records indicate that he was cleared to, among other things, return to work "as tolerated." He returned to work on November 3, 2008. During his absence, Joe Monaco replaced Stephen Dudzinski as Project Leader.

Plaintiff claims that on November 3, 2008 he left an "email" (addressed to Ms. Weiland and cc'd to Mr. Dudzinski and Ms. Hirsch) on the chairs of Ms. Weiland and Ms. Hirsch.[1] The purported "email" recites plaintiff's health problems and requests, as an accommodation, that he be granted time off for further medical testing.

---

[1] Plaintiff describes the document as an "email." It does not appear to be an email; it appears to have been created with a word-processor. None of the recipients testified to having received it. Nevertheless, whether or not such a document was in fact "emailed" to the recipients is not a genuine issue of material fact because plaintiff was granted time off for medical testing.

In a meeting held on November 6, 2008 and attended by plaintiff, Mr. Monaco, Ms. Hirsch, and Ms. Weiland, plaintiff was given a document in connection with the PIP. It enumerated the alleged shortcomings in his performance at work, including errors associated with the WARR project and certain change packages, and detailed the procedures that would be followed with respect to his work going forward. Plaintiff acknowledged receipt of the document by signing it, but he indicated on it that he did not agree with its substance. The document noted that if the PIP was unsuccessful, "further disciplinary action will be taken, ... up to and including dismissal."

Plaintiff informed Mr. Monaco after the meeting that he needed time off from work for a vascular test. Mr. Monaco referred plaintiff to Occupational Health Nurse Mary McCaughey to discuss the various leave options available to him, because plaintiff had exhausted his accrued sick days and vacation days. Plaintiff told Ms. McCaughey on November 10, 2008 that he needed four hours off the following day for a medical test and that he would make up the time. Ms. McCaughey approved plaintiff's request, and she discussed with him the possibility of short term disability leave or intermittent FMLA leave if he needed additional time off from work. Plaintiff advised Mr. Monaco and Ms. Weiland of his expected absence and was absent the morning of November 11, 2008 for vascular tests, as requested.

UPS discontinued plaintiff's PIP and terminated his employment on November 12, 2008. The termination letter indicates that the termination was performance-based; it states that two programming errors committed by plaintiff on November 10, 2008 resulted in the decision to terminate plaintiff's employment.

In January 2009, following his termination, plaintiff was diagnosed with NPH. Dr. Ghiasian informed plaintiff that NPH causes memory loss and referred him to a neuropsychologist, Dr. Jeannie Brooks, for cognitive testing. He was examined by Dr. Brooks in April 2009. The test results indicated that his overall neuropsychological functioning was in the Extremely Low range (bottom 0.03 percentile), particularly with respect to attention and delayed memory (bottom 0.38 percentile). His immediate memory tested in the 5th percentile.

## III.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, "summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. *Peters v. Del. River Port Auth.*, 16 F.3d 1346, 1349 (3d Cir. 1994). The judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 860 (3d Cir. 1990).

The party seeking summary judgment always bears the initial burden of production. *Celotex*, 477 U.S. at 323. This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden. *Id.* at 322-23. This burden can be "discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

To avoid summary judgment, the nonmoving party must then demonstrate facts supporting each element for which it bears the burden, thus establishing the existence of a "genuine issue of material fact" justifying trial. *Miller*, 843 F.2d at 143; *accord Celotex*, 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id*. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Further, summary judgment may be granted if the nonmoving party's "evidence is merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249-50.

IV. **DISCUSSION**

    A. **Wrongful Termination**

Plaintiff alleges that UPS terminated his employment due to his diabetes, in violation of the New Jersey Law Against Discrimination. It "prohibit[s] any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J. Stat. Ann. § 10:5-4.1. However, "[n]othing contained in this act ... shall be construed to ... prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards." *Id.* § 10:5-2.1. To establish a violation of the LAD, the decision to terminate plaintiff must have been motivated by discriminatory intent. *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1138 (N.J. 2005) ("What makes an employer's personnel action unlawful is the employer's intent.").

Analysis of a wrongful termination claim under the LAD involves the same burden-shifting analysis as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Zive*, 867 A.2d at 1139. At step one, for the purpose of this motion only, defendant concedes that plaintiff can establish a *prima facie* case. At step two, defendant has articulated a non-discriminatory rationale for plaintiff's termination: poor performance.

At step three, plaintiff has the burden to establish a genuine issue of material fact as to whether the alleged performance-based rationale is a pretext for unlawful discrimination. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) ("[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder

8

reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).") (internal citations omitted);[2] *Zive*, 867 A.2d at 1140 ("To prove pretext, a plaintiff may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent."). "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.

      Plaintiff cannot meet his burden to establish a genuine issue of material fact. The undisputed evidence in the record shows that plaintiff's programming work contained many serious errors and that he had difficulty following directions, remembering assignments, working independently, and meeting deadlines. It is also undisputed that plaintiff was denied a performance-based bonus under the management incentive plan and was placed in a PIP prior to missing any work for tests relating to his illness. Defendant has produced evidence (plaintiff's termination letter and corroborative testimony) indicating that, during the PIP, plaintiff committed two additional programming errors that precipitated his termination. Plaintiff has

---

[2] New Jersey courts interpreting the LAD look to federal decisions "as a key source of interpretive authority." *Grigoletti v. Ortho Pharm. Corp.*, 570 A.2d 903, 906 (N.J. 1990).

come forward with no evidence rebutting that showing.[3]  These facts support a performance-based rationale.

Plaintiff has cited no evidence indicating that defendant's alleged performance-based rationale for terminating him was false.  He has suggested that his performance issues were due to his illness, which prevented him from checking his own work effectively, and to the refusal of his supervisor Ms. Weiland and his co-worker Mr. Broytman to provide him with written instructions or sufficient guidance.  But even viewed in the light most favorable to plaintiff, these explanations cannot revive his claim because they go to whether the performance-based rationale for terminating his employment was "wrong or mistaken," *Fuentes*, 32 F.3d at 765, and not whether it was a pretext for discrimination.[4]  Since plaintiff cannot meet his burden, summary judgment on this claim is warranted.

**B.     Failure to Accommodate**

---

[3]     Additionally, in response to defendant's assertions in its 56.1 statement concerning the two coding errors, plaintiff stated, "Neither admitted nor denied; not within plaintiff's knowledge."  Local Rule 56.1 provides, "The opponent shall of summary judgment shall furnish, with its opposition papers, a responsive statement, indicating *agreement or disagreement* and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; *any material fact not disputed shall be deemed undisputed for the purposes of the summary judgment motion*." (emphasis added)  Discovery in this case is complete; plaintiff must come forward with evidence to establish a triable issue of fact.  He cannot avoid summary judgment by claiming that material facts are not within his knowledge.

[4]     Insofar as plaintiff's poor performance was attributable to his illness, an employer may lawfully terminate an employee whose disability "reasonably precludes the performance of the particular employment" or discriminate "among individuals on the basis of competence [or] performance."  N.J. Stat. Ann. §§ 10:5-4.1, -2.1.

Plaintiff also asserted during discovery that UPS failed to accommodate his disability.[5]  *See* N.J. Admin. Code § 13:13-2.5(b)(2) ("An employer shall consider the possibility of reasonable accommodation before firing, demoting or refusing to hire or promote a person with a disability on the grounds that his or her disability precludes job performance.").  This claim is not raised in the complaint, and plaintiff failed to amend the complaint to incorporate it in the time provided by the Magistrate Judge.[6]  Nor has plaintiff sought leave of Court to so amend.  The claim therefore need not be considered here.[7]

---

[5]  Plaintiff testified that he made several requests for accommodations for his diabetic condition that were denied, to wit: receiving assistance from co-workers on his assignments; extensions of deadlines; additional written clarification on his assignments; a larger computer screen; and time off for medical testing.  The undisputed record reflects that plaintiff's requests for time off for medical testing were approved.

[6]  The deadline to amend the pleadings pursuant to the Magistrate Judge's scheduling order expired on June 30, 2009.

[7]  Even if plaintiff had timely raised the claim, it would be without merit.  Failure to accommodate an employee is actionable under the LAD where "(1) [the employee] was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated."  *Armstrong v. Burdette Tomlin Memorial Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006).  However, it is not necessary to offer an accommodation "where it can reasonably be determined that [plaintiff], as a result of [his] disability, cannot perform the essential functions of the job even with reasonable accommodation."  *See* N.J. Admin. Code § 13:13-2.8(a).  Thus, if there is no genuine issue of material fact that plaintiff could not perform the essential functions of the senior programmer analyst position, even with reasonable accommodation, summary judgment would be appropriate.

The SPA position is highly skilled and requires substantial analytical ability, focus, and attention to detail.  It is undisputed that the essential functions of the SPA position include having the cognitive ability to follow directions and routines, work independently with appropriate judgment, and concentrate, memorize, and recall.  It is also undisputed that plaintiff had substantial difficulty with attention and memory loss during his employment at UPS, resulting in his inability to, among other things, remember instructions and check his work for errors.  This is corroborated by plaintiff's medical records, which indicate that his cognitive abilities in attention and delayed memory are "Extremely Low" (in the bottom 0.38 percentile).

V.   **CONCLUSION**

        For the reasons set forth in this opinion, it is **ORDERED** that defendant's motion for summary judgment is **GRANTED**, and it is **ORDERED** that this case is **CLOSED**.

                         /s/ Faith S. Hochberg
                         Hon. Faith S. Hochberg, U.S.D.J.

---

Plaintiff has not identified a reasonable accommodation that would have allowed him to perform his job, particularly with respect to his problems with memory loss and concentration. He requested from Ms. Weiland that a coworker be assigned to check his work, and that Mr. Broytman provide him with written specifications for his assignments. But it would not be a reasonable accommodation under the LAD to require UPS to assign other employees to perform tasks, in addition to their own responsibilities, that plaintiff was hired to do. *See Baker v. Hunter Douglas Inc.*, 270 F. App'x 159, 163 (3d Cir. 2008) (affirming District Court's grant of summary judgment in part on grounds that plaintiff's request that defendant "allow her to share her duties with another employee is not a reasonable accommodation under NJLAD"). Moreover, the undisputed record shows that plaintiff's request for time off from work on November 11, 2008 for medical tests, as an accommodation for his illness, was approved.

        It is unfortunate that plaintiff's medical condition impaired his memory and other cognitive functions to such a degree. Nevertheless, based on the undisputed evidence, there is no genuine issue of material fact as to whether plaintiff was capable of performing the essential functions of a senior programmer analyst.